# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BONNIE WILSON, on behalf of herself and all others similarly situated,<br><br>                 Plaintiff,<br><br>      v.<br><br>SIRIUS XM RADIO INC.,<br><br>             Defendant. | CIVIL ACTION NO.<br><br>**CLASS ACTION COMPLAINT AND JURY DEMAND** |

Plaintiff Bonnie Wilson, individually, and on behalf of all others similarly situated, alleges as follows, on personal knowledge and investigation of her counsel, against Defendant Sirius XM Radio Inc. ("Sirius XM" or "Defendant"):

## I.    <u>INTRODUCTION</u>

1.    This is a proposed class action, brought under New York law on behalf of a nationwide class of current and former Sirius XM subscribers, challenging a false advertising and deceptive pricing scheme whereby Sirius XM falsely advertises its music plans at lower prices than it actually charges. Sirius XM fails to include in its advertised prices the amount of its invented "U.S. Music Royalty Fee," which increases the true plan price by 21.4% above the advertised price for the plans.[1]

2.    Sirius XM intentionally does not disclose the Fee to its subscribers. Sirius XM even goes so far as to not mention the words "U.S. Music Royalty Fee" in <u>any</u> of its advertising, including in the fine print.

---

[1] The rate for the U.S. Music Royalty Fee is 21.4% for Sirius XM's <u>satellite radio</u> music plans (which comprise the overwhelming majority of Sirius XM subscriptions), and 8.8% for Sirius XM's <u>streaming-only</u> music plans (which are internet-only and do not require a satellite radio, and which comprise a tiny minority of Sirius XM subscriptions).

3.      Once consumers have been lured to sign up, Sirius XM prevents them from learning about its scheme by never thereafter sending them monthly or ongoing billing notices or invoices. All the while, Sirius XM silently and automatically renews their subscriptions month after month and year after year. And, as the price of its subscribers' music plans increase—e.g., when a promotional rate expires—the U.S. Music Royalty Fee amount, being a flat 21.4% charge, also increases.

4.      Notably, <u>none</u> of Sirius XM's competitors charge any separate royalty fee over and above their advertised music plan prices. Reasonable consumers would expect that the advertised price for Sirius XM's music plans would include the fundamental costs of obtaining the permissions necessary to provide the music content that Sirius XM has promised is included in those plans. The U.S. Music Royalty Fee is, in fact, simply a disguised double-charge for the music plan itself.

5.      Even the name of the U.S. Music Royalty Fee is deceptive. Sirius XM calls it a "U.S." fee to falsely indicate to consumers (i.e., to those few consumers who learn about its existence) that it is a government-related fee.

6.      In the event that a subscriber happens to notice the U.S. Music Royalty Fee has been charged and then contacts Sirius XM to inquire about the Fee, Sirius XM has a practice of outright falsely telling the subscriber that it is "government mandated" or is a government pass-through fee.

7.      Sirius XM's U.S. Music Royalty Fee scheme has been the source of <u>all</u> of Sirius XM's profits for the past several years. For example, in 2023, Sirius XM collected $1.36 billion in U.S. Music Royalty Fee charges, while the entire company had net profits of $1.26 billion. In

other words, in 2023, U.S. Music Royalty Fee revenues were equal to 108% of the net profits for the entire company.[2]

8.      Sirius XM falsely advertised the prices of its music plans to Plaintiffs and Class members, and Sirius XM never adequately disclosed to them that the U.S. Music Royalty Fee would be charged or its true nature. Meanwhile, Sirius XM's sign-up process, automatic renewal process, and policy of not sending monthly or ongoing billing notices or invoices are deliberately designed to prevent subscribers from learning of the U.S. Music Royalty Fee.

9.      Sirius XM automatically charges the U.S. Music Royalty Fee to nearly all of its subscribers nationwide.  Since Sirius XM invented and introduced the Fee in 2009, Plaintiff estimates that Sirius XM has unlawfully extracted **over $10 billion** from its customers nationwide in unlawful U.S. Music Royalty Fee charges.

10.     Plaintiff seeks restitution on behalf of herself and the Class, including disgorgement of all revenues Sirius XM obtained from them as a result of the unlawful conduct alleged herein. Plaintiff further seeks damages for herself and Class members in the amount they paid in U.S. Music Royalty Fees, plus statutory, treble, and punitive damages.

11.     Plaintiff seeks declaratory, monetary, and statutory relief for herself and the proposed Class to obtain redress, bringing claims under New York General Business Law §§ 349 and 350, as well as New York common law.

---

[2] In 2023, Sirius XM had subscriber revenues from its SiriusXM-branded service of $6.34 billion, approximately 21.4% of which (i.e., $1.36 billion) were payments of the U.S. Music Royalty Fee. *See* 2023 10-K of Sirius XM Holdings Inc., pp. F-5, F-39, available at https://investor.siriusxm.com/sec-filings/all-sec-filings/content/0000908937-24-000008/0000908937-24-000008.pdf.

## II.    THE PARTIES

12.    Plaintiff Bonnie Wilson is a citizen and resident of Bath, New York, and was a subscriber of Sirius XM's music plans during the class period. Like every other Class member, Plaintiff Wilson has been victimized by the same uniform policies described in detail herein, in that she viewed Sirius XM's deceptive advertisements and signed up for Sirius XM's music plans on the Sirius XM website in the manner described herein, and paid the undisclosed, extra-contractual U.S. Music Royalty Fee complained of herein.

13.    Defendant Sirius XM Radio Inc. ("Sirius XM") is a corporation chartered under the laws of Delaware, with its principal place of business in New York, and thus is a citizen of Delaware and New York.

14.    Defendant Sirius XM Radio Inc. created, implemented, and received the proceeds from the unlawful scheme at issue in this Complaint, namely, the imposition, charging, and collection of the undisclosed, extra-contractual U.S. Music Royalty Fee to its customers.

## III.    JURISDICTION AND VENUE

15.    Jurisdiction over this matter is proper in the United States District Court under the Class Action Fairness Act in that this is a proposed class action, Defendant Sirius XM is a citizen of a different state than at least one member of the proposed nationwide Class, and the amount in controversy far exceeds $5 million.

16.    This Court has personal jurisdiction over Sirius XM because: (1) Sirius XM is a citizen of, and has its principal place of business in, the State of New York; (2) Sirius XM is authorized to do business and in fact regularly conducts business in the State of New York; (3) the claims alleged herein took place primarily in New York, where Sirius XM created, imposed,

and collected the complained-of Fee; and/or (4) Sirius XM has committed tortious acts within the State of New York (as alleged, without limitation, throughout this Complaint).

17.     Venue is proper pursuant to 28 U.S.C. §1391 in the Southern District of New York, in that Defendant Sirius XM is a citizen of and maintains its principal place of business in this District.

## IV.    NEW YORK LAW APPLIES TO THE CLAIMS OF PLAINTIFF AND THE CLASS

18.     New York law applies to the claims of Plaintiff and the Class because, *inter alia*: (1) Plaintiff and each Class member purchased services from Sirius XM's headquarters in New York; (2) they each were charged the complained-of U.S. Music Royalty Fee by Sirius XM from its headquarters in New York; (3) the complained-of Fees were paid to and collected by Sirius XM at its headquarters in New York; and/or (4) Sirius XM's misrepresentations, omissions, false and misleading conduct, deceptive acts, and other unlawful policies complained of herein arose from and were made at Sirius XM's headquarters in New York. Thus, a substantial part of Sirius XM's complained-of conduct occurred in and emanated from New York state. *See*, *e.g.*, *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 124 (2d Cir. 2013). In addition, Sirius XM has made clear that it intends that New York law should apply, given that Sirius XM inserted a New York choice of law clause in the form customer agreement posted on its website.

## V.    FACTUAL ALLEGATIONS OF SIRIUS XM'S DECEPTIVE PRICING SCHEME

19.     Defendant provides Sirius XM-branded satellite radio and internet-only streaming plans to approximately 33.9 million consumers nationwide.[3] Nearly all of the service plans offered by Sirius XM include music channels ("music plans").

---

[3] *See* 2023 10-K of Sirius XM Holdings Inc., p. 5, available at https://investor.siriusxm.com/sec-filings/all-sec-filings/content/0000908937-24-000008/0000908937-24-000008.pdf.

20.     Sirius XM falsely advertises its music plans at lower rates than it actually charges by not including in the advertised price the amount of its invented "U.S. Music Royalty Fee." Sirius XM intentionally does not disclose the extra charge. Sirius XM even goes so far as to not mention the words "U.S. Music Royalty Fee" in any of its advertising, including in the fine print. Once consumers have been lured to sign up, Sirius XM prevents them from learning about its scheme by never thereafter sending them monthly or ongoing billing notices or invoices. All the while, Sirius silently and automatically renews their subscriptions month after month and year after year.

21.     Sirius XM imposes the U.S. Music Royalty Fee on all subscribers of its satellite radio music plans (satellite radio subscribers comprise the overwhelming majority of Sirius XM subscribers), at a rate of 21.4% on top of the advertised and promised price of the music plan. Sirius XM also imposes the U.S. Music Royalty Fee on the relatively few subscribers of its Sirius XM-branded internet-only streaming music plans (which do not require a satellite radio), at a rate of 8.8% on top of the advertised and promised price of the music plan.[4]

22.     The overwhelming majority of Sirius XM subscribers utilize Sirius XM's services in their automobiles. There are approximately 160 million vehicles in operation that are equipped with Sirius XM radios.[5] Sirius XM's satellite radios are pre-installed at the factory in 84% of the over 13 million new automobiles sold each year in the United States.[6] All of the 13 million-plus

---

[4] The only Sirius XM internet-only streaming music plan subscribers who are not charged the U.S. Music Royalty Fee are streaming music subscribers who are signed up and billed through the Apple App Store or Google Play Store platforms.

[5] See 2023 10-K of Sirius XM Holdings Inc., p. 5, available at https://investor.siriusxm.com/sec-filings/all-sec-filings/content/0000908937-24-000008/0000908937-24-000008.pdf.

[6] See "Car Market Puts Sirius XM's 2022 Growth Plans Into The Slow Lane," InsideRadio.com, July 28, 2022, available at https://www.insideradio.com/free/car-market-puts-Sirius XM-s-2022-growth-plans-into-the-slow-lane/article_c577b85c-0ea6-11ed-a4f3-

annual buyers of new vehicles are <u>automatically</u> provided a free two- to six-month trial of Sirius XM service. Sirius XM's satellite radios are also already installed in 51% of the 36 million used automobiles sold each year.[7] Many of the buyers of these used vehicles are likewise automatically enrolled in free Sirius XM trials.

23.     Sirius XM's business model relies on converting these millions of vehicle buyers from free trial users into paid subscribers of automatically renewing music plans.

24.     This effort begins with a revenue-sharing arrangement with the leading automakers: Sirius XM pays over $1 billion a year in subsidies and revenue splits to the automakers.[8] Pursuant to this revenue sharing arrangement, automotive dealerships submit the contact information of their recent car buyers directly to Sirius XM's marketing department. The automakers and auto dealers then get a cut of the Sirius XM subscription revenue that results.

25.     After receiving the contact information of the vehicle buyers, Sirius XM proceeds to inundate them with marketing emails, direct mailers, and telemarketing calls in an attempt to get the consumers to provide their credit or debit card information to Sirius XM so that Sirius XM can sign them up for paid—and automatically renewing—music plan subscriptions.

A.     **The U.S. Music Royalty Fee.**

26.     The U.S. Music Royalty Fee is an additional flat charge that Sirius XM collects from its music plan subscribers over and above the advertised and promised prices of its music

---

6316ccfafd88.html#:~:text=Its%20receivers%20are%20now%20installed,satellite%20radio%20don't%20bother.

[7] *Id. See also* report on used vehicle market based on data from Cox Automotive, at https://www.autonews.com/used-cars/used-car-volume-hits-lowest-mark-nearly-decade#:~:text=The%20number%20of%20used%20cars,about%2035.8%20million%20were%20sold.

[8] For example, in 2016, Sirius XM paid about $1 billion a year in subsidies and revenue splits to automakers. *See* Sisario, Ben, "Sirius XM Fights to Dominate the Dashboard of the Connected Car," New York Times, February 20, 2016 (behind pay wall at https://www.nytimes.com/2016/02/21/business/media/Sirius XM-fights-to-dominate-the-dashboard-of-the-connected-car.html).

plans. The overwhelming majority of Sirius XM customers subscribe to its <u>satellite radio</u> music plans (which require a satellite radio, and are typically attached to a particular vehicle equipped with a Sirius XM satellite radio). Sirius XM charges its satellite radio music plan subscribers a 21.4% U.S. Music Royalty Fee on top of the advertised and promised price of the music plan.

27.    In 2019, Sirius XM introduced a separate <u>streaming-only</u> music plan option, which worked over the internet and did not utilize or require a satellite radio. A very tiny minority of Sirius XM customers subscribe to such an internet streaming-only music plan. Sirius XM charges its (few) internet streaming-only music plan subscribers an 8.8% U.S. Music Royalty Fee on top of the advertised and promised price of the streaming music plan.

28.    Sirius XM first added the U.S. Music Royalty Fee to its music plans in 2009, at a 13.9% flat rate charge. Since then Sirius XM has increased the Fee to the current 21.4% rate.

29.    Sirius XM's U.S. Music Royalty Fee scheme has been the source of <u>all</u> of Sirius XM's profits for the past several years. For example, in 2023, Sirius XM collected $1.36 billion in U.S. Music Royalty Fee charges, while the entire company had net profits of $1.26 billion. In other words, in 2023, U.S. Music Royalty Fee revenues were equal to 108% of the net profits for the entire company.[9]

30.    The U.S. Music Royalty Fee scheme is at the heart of Sirius XM's marketing plan. The scheme enables Sirius XM to falsely advertise its music plans at much lower prices than what Sirius XM actually charges, in order to lure as many consumers as possible into signing up for automatically renewing subscriptions and paying more than they otherwise would have paid.

---

[9] In 2023, Sirius XM had subscriber revenues from its Sirius XM-branded service of $6.34 billion, approximately 21.4% of which (i.e., $1.36 billion) were payments of the U.S. Music Royalty Fee. *See* 2023 10-K of Sirius XM Holdings Inc., pp. F-5, F-39, available at https://investor.siriusxm.com/sec-filings/all-sec-filings/content/0000908937-24-000008/0000908937-24-000008.pdf.

31.     Meanwhile, Sirius XM is alone in charging such a fee. None of Sirius XM's major music streaming competitors (for example, Apple Music, Spotify, Amazon Music, Google Play Music) charge any such separate music royalty fee over and above their advertised music plan prices. Reasonable consumers would expect that the advertised price for Sirius XM's music plans would include the fundamental cost of obtaining the permissions necessary to provide the music content that Sirius XM has promised is included in those plans. The U.S. Music Royalty Fee is, in fact, simply a disguised double-charge for the music plan itself.

32.     Sirius XM automatically charges the U.S. Music Royalty Fee to nearly all of its subscribers nationwide. Since Sirius XM invented and introduced the Fee in 2009, Plaintiff estimates that Sirius XM has unlawfully extracted over $10 billion from its customers in U.S. Music Royalty Fee charges.

**B.     Sirius XM Misrepresents the Price of Its Music Plans in Its Advertisements and Fails to Disclose the U.S. Music Royalty Fee.**

33.     Sirius XM advertises its music plans through marketing directed at the consuming public throughout the United States via email campaigns, direct mail campaigns, telemarketing campaigns, internet advertising, television advertising, and radio advertising. Meanwhile, the tens of millions of automobiles which are equipped with a Sirius XM satellite radio, but which do not have an active trial or a current paid subscription, will constantly prompt the consumer to subscribe to Sirius XM anytime the consumer switches the car audio system to the Sirius XM radio setting.

34.     In all of its marketing, Sirius XM prominently and misleadingly advertises particular flat monthly or periodic prices for its music plans, without disclosing or including the amount of the U.S. Music Royalty Fee in the advertised price.

35.    <u>None</u> of Sirius XM's advertisements states the true music plan price after adding the amount of the U.S. Music Royalty Fee. <u>None</u> of Sirius XM's advertisements names or mentions the existence of the U.S. Music Royalty Fee or its amount—not even in the fine print. And there is no asterisk adjacent to the (deceptively low) advertised price in any of Sirius XM's advertisements or materials.

36.    Meanwhile, <u>none</u> of Sirius XM's competitors charge any separate royalty fee over and above the advertised music plan price. Sirius XM knows that reasonable consumers would not expect Sirius XM to charge the U.S. Music Royalty Fee. Sirius XM knows that reasonable consumers would expect that the advertised price for Sirius XM's music plans would include the fundamental costs of obtaining the permissions necessary to provide the music content that Sirius XM has promised is included in those plans. The U.S. Music Royalty Fee is, in fact, simply a disguised double-charge for the music plan itself.

37. **Example Direct Mail Advertisement.** Below is an example of a direct mail flyer sent by Sirius XM in December 2022 to a consumer who was in a Sirius XM free trial that automatically came with a new vehicle:

**Sirius XM Advertising Mailer to Consumer in Free Trial With New Vehicle**



38.     The above flyer is a typical example of the millions of direct mail advertisements that Sirius XM sends to new vehicle purchasers each year who were automatically (with no affirmative action by them) enrolled in a free trial when they purchased a vehicle.

39.     Sirius XM's business model relies on converting these millions of vehicle buyers from free trial users into paid subscribers of automatically renewing music plans (e.g., "Act now before your trial ends").

40.     Notably, the top right of the ad features "Get 12 Months for $5/Month," but makes no mention of the U.S. Music Royalty Fee or the extra 21.4% (i.e., the extra $1.07) that the plan actually costs due to the Fee. There is no asterisk next to the advertised price. Nowhere in the entire mailer—not even in the fine print at the bottom—is there any mention whatsoever of the U.S. Music Royalty Fee or its amount. The only disclosure language in the entire mailer is the phrase "Fees and taxes apply," which is in small print in the circle on the left of the ad, where it also says, "See Offer Details below."

41.     But the "Offer Details" (which can be found in the fine print at the bottom of the flyer) likewise only states the same phrase "Fees and taxes apply," with no further details. It does not mention the U.S. Music Royalty Fee by name or what the additional "Fees and taxes" are or their amounts. The "Offer Details" fine print states that the plan will renew after the 12-month promotion "at then-current rates (currently, $17.99)"—but again does not disclose that the actual rate the plan will be renewed at is 21.4% higher (at a true rate of $21.84) due to the U.S. Music Royalty Fee. Nor does the mailer mention that, as the music plan rate increases from $5 to $17.99, the (undisclosed) Fee will more than triple from $1.07 to $3.85.[10]

---

[10] The intentional nature of Sirius XM's misrepresentations and omissions are further evidenced by the fact that while the United States company Sirius XM Radio Inc. (the Defendant) made the decision to completely avoid mentioning the name of the U.S. Music Royalty Fee or its amount in any of its advertising, the company's Canadian sister company, Sirius XM Canada Inc., chose a different, more

42.    **<u>Example Marketing Email.</u>** Below is an example of a marketing email sent by Sirius XM in February 2023 to a consumer whose free Sirius XM trial elapsed (the free trial came with the purchase of a new vehicle):

**Sirius XM Marketing Email to Consumer Whose Free Trial Elapsed**



---

honest approach. Sirius XM Canada Inc. (unlike Defendant) discloses both the name of the fee (which in Canada is called the "Music Royalty and Administrative Fee") and its percentage amount in the "Offer Details" fine print of its otherwise identical ads.

43.     The above email is a typical example of the millions of marketing emails Sirius XM sends to purchasers of new automobiles whose automatic free trials have elapsed. Notably, the email states the price is "JUST $5/MO," but makes no mention of the U.S. Music Royalty Fee or the extra 21.4% (i.e., the extra $1.07) that the plan actually costs due to the Fee. There is no asterisk next to the advertised price, and in fact nowhere in the entire email—not even in the fine print at the bottom—is there any mention whatsoever of the U.S. Music Royalty Fee or its amount. There is a phrase "See Offer Details," but there is no "Offer Details" section in the email. It turns out that the white "Offer Details" text is a non-obvious hyperlink (with no hyperlink indicators).

44.    If the consumer figured out to click on the "Offer Details" text on the email, the consumer would be brought to the "Offer Details" webpage below:

**"Offer Details" Webpage**



45.    This "Offer Details" webpage features "$5/mo for 12 months," but makes no mention of the U.S. Music Royalty Fee or the extra 21.4% (i.e., the extra $1.07) which the plan actually costs due to the Fee. Below the prominent text "$5/mo for 12 months," smaller text reads, "Then $18.99/mo. Fees & taxes apply. See **Offer Details** below."

15

46.     But the fine print "Offer Details" at the bottom of the webpage states only the same phrase "Fees and Taxes apply," with no further details. It does not mention the U.S. Music Royalty Fee by name or what the additional "Fees and Taxes" are or their amounts. It also fails to mention that the renewal rate will not be the promised "$18.99/mo." but rather will be 21.4% higher—where the undisclosed Fee will increase nearly four-fold to $4.06—for an actual total of $23.05 per month.

47.     Consequently, these advertisements were and are false because the offered Sirius XM music plans are not "JUST $5/MO", nor will they renew at "$18.99/mo." as promised. Rather, the true prices of the music plans will be 21.4% higher than Sirius XM advertised, due to Sirius XM's unilateral addition of the undisclosed, extra-contractual U.S. Music Royalty Fee to the promised rates.

**C.     Sirius XM Fails to Disclose the U.S. Music Royalty Fee to Consumers When They Sign Up on Its Website.**

48.     For years, Sirius XM's consumer website has advertised its music plans by featuring particular flat monthly or periodic prices for the plans, without disclosing or including the amount of the U.S. Music Royalty Fee in the advertised price.

49.     For example, in May 2023, Sirius XM's website listed the following music plans (on the "Browse Plans and Pricing" webpage):

**Music Plans Offered on the Sirius XM Website**



50.    All of these options (including both the 3-month promotional $1 price, and the stated higher prices after the 3 months) are presented as having a flat rate. The prices exclude the additional 21.4% charge for the U.S. Music Royalty Fee. The prices do not have asterisks and the only disclosure language is on the left side, where smaller print says, "Plus fees and taxes <u>See Offer Details Below</u>." But the "Offer Details" at the bottom of the webpage (which follows a section of "Frequently Asked Questions" that likewise makes no mention of the Fee), states only

17

the same phrase "Fees and taxes apply." It does not mention the U.S. Music Royalty Fee by name or what the additional "Fees and taxes" are or their amounts.

51.     If the consumer clicks on the blue "GET" button for the respective music plan, the consumer is taken through Sirius XM's online purchase process. Each page of the purchase process features "$1 for 3 months" on the top, and smaller text stating the higher price after the 3 months (e.g., "Then 23.99/mo.").

52.     **Below is the final page of the online purchase process** (i.e., the order submission page) for the Platinum music plan. This final page is the only page of the entire online purchase process which lists a specific additional amount for "Fees and Taxes."

53.    Under "Order Summary," Sirius XM shows a price of $1.00 for 3 months of the music plan ($0.33/mo), plus "Fees and Taxes" of $0.21.  In this example, "Fees and Taxes" are comprised entirely of the unmentioned 21.4% U.S. Music Royalty Fee (i.e., $0.21 = 21.4% of the $1.00 plan price). Similarly, when the promotional rate of "$1.00 for 3 months" expires and the customer's monthly rate automatically increases to the stated "$23.99/mo.," the U.S. Music Royalty Fee comprises the entire amount of the additional "Fees and Taxes" of $5.13 per month.

54.    Sirius XM knows and intends that reasonable consumers will understand and assume that the amount listed as "Fees and Taxes" is comprised of legitimate taxes and government-related fees passed on by Sirius XM to its subscribers.

55.    Sirius XM knows and intends that reasonable consumers would not expect that Sirius XM—unlike every other music streaming service—would invent and charge the so-called "U.S. Music Royalty Fee" over and above the advertised price for the music plan. Sirius XM knows that reasonable consumers would expect that the advertised price for Sirius XM's music plans would include the fundamental costs of obtaining the permissions necessary to provide the music content that Sirius XM has promised is included in those plans. The U.S. Music Royalty Fee is, in fact, simply a disguised double-charge for the music plan itself.

**D.    Sirius XM Fails to Disclose the U.S. Music Royalty Fee to Consumers When They Sign Up Over the Phone.**

56.    Likewise, Sirius XM sales and customer service agents have been trained for years, as a matter of company policy, to present consumers with the same flat monthly or periodic prices for its music plans without disclosing the U.S. Music Royalty Fee. The music plan prices that agents quote to consumers—just like Sirius XM's advertising—exclude the cost of the U.S. Music Royalty Fee.

57.     Sirius XM's U.S. Music Royalty Fee scheme enables Sirius XM to falsely advertise and present its music plans at much lower prices than what Sirius XM actually charges, in order to lure as many consumers as possible into signing up for automatically renewing subscriptions and paying more than they otherwise would have paid.

**E.     In Order to Prevent Subscribers From Learning of Its Scheme, Sirius XM Signs Up Subscribers for Auto-Renewal by Default and Then Never Sends Them Monthly or Ongoing Billing Notices or Invoices.**

58.     Sirius XM's automatic renewal and billing process are designed to prevent its subscribers from learning of its U.S. Music Royalty Fee scheme. Sirius XM signs up subscribers for automatic renewal by default (most subscribers have monthly plans, but Sirius XM also offers three month, six month, and annual plans).

59.     Once consumers have been lured to sign up, Sirius XM prevents them from learning about its scheme by never thereafter sending them monthly or ongoing billing notices or invoices. All the while, Sirius XM silently and automatically renews their subscriptions month after month and year after year

60.     Most Sirius XM subscribers sign up for a paid subscription with Sirius XM by providing their credit card or debit card for a multi-month greatly discounted promotional rate. The only evidence of the ongoing monthly (or other subscription term) charges by Sirius XM that a subscriber may find is on his or her bank or credit card billing statement—which only lists a dollar amount and makes no mention of the U.S. Music Royalty Fee.

61.     It is telling that while Sirius XM intentionally sends <u>zero</u> monthly or ongoing billing notices or invoices to its subscribers, Sirius XM meanwhile makes sure to inundate and benumb these same subscribers with <u>marketing</u> emails nearly every other day (totaling over a dozen each month), such that subscribers come to assume that any emails they receive from Sirius XM are marketing or promotional emails.

21

**F.     Sirius XM Continues to Deceive Subscribers After They Sign Up.**

62.     Sirius XM continues to deceive subscribers about the true price of its music plans and about the existence and nature of the U.S. Music Royalty Fee, even after they have signed up.

63.     As discussed above, once consumers have been lured to sign up, Sirius XM prevents them from learning about its scheme by never thereafter sending them monthly or ongoing billing notices or invoices.

64.     But even if a subscriber discovered the existence of the U.S. Music Royalty Fee, Sirius XM has taken actions and implemented policies to intentionally mislead the subscriber into thinking it is "government mandated" or is a government pass-through fee.

65.     First, Sirius XM intentionally chose a name for the Fee that suggests it is a government fee. Sirius XM calls it a "U.S." fee to falsely indicate to consumers (i.e., to those few subscribers who learn about its existence) that it is government mandated or is a government pass-through fee.

66.     Second, in the event that a subscriber contacts Sirius XM to inquire about the Fee, **Sirius XM agents outright falsely tell the subscriber that the Fee is "government mandated" or is a government pass-through fee.**

67.     For example, below is a screenshot of part of an online chat conversation that a subscriber had with Sirius XM on March 10, 2023, where the Sirius XM agent falsely told the subscriber that the U.S. Music Royalty Fee was "government mandated":

22



68.     The chat agent's statement that the U.S. Music Royalty Fee was "government mandated" reflects Sirius XM's policy of falsely telling subscribers who ask about the Fee that it is government mandated or is a government pass-through fee.

## V.     PLAINTIFF'S FACTUAL ALLEGATIONS

69.     Plaintiff Bonnie Wilson is, and at all relevant times has been, a citizen and resident of Bath, New York.

70.     In late 2021, Ms. Wilson purchased a car that came with a free three-month Sirius XM music plan trial subscription.

71.     In late January 2022, towards the end of the free trial, Ms. Wilson received a marketing email from Sirius XM in which Sirius XM offered a promotional price for a six-month music plan subscription. The email included a link to Sirius XM's website where Ms. Wilson

could purchase the six-month music plan subscription. Ms. Wilson clicked the link in the email and went through the online purchase process. Throughout the online purchase process, Sirius XM advertised and promised a specific monthly price for the music plan subscription. That price did not include the amount of the U.S. Music Royalty Fee. None of the webpages made any reference to the U.S. Music Royalty Fee or its amount. Based on these representations, Ms. Wilson entered her credit card information and submitted her order on the Sirius XM website.

72.     At no point was Ms. Wilson aware that Sirius XM would bill her any additional monthly music plan charges above the specific monthly price that was advertised and promised to her. At no point did Ms. Wilson view any mention of the existence of the U.S. Music Royalty Fee or its amount.

73.     At the end of the six months paid subscription, Ms. Wilson canceled her service.

74.     When Ms. Wilson signed up for her Sirius XM music plan, she was relying on Sirius XM's explicit representations regarding the monthly price of the music plan. Ms. Wilson did not expect (and she was never told) that Sirius XM would actually charge her an additional music plan charge on top of the advertised and quoted music plan price in the form of a so-called U.S. Music Royalty Fee or that the true price of the music plan would include the 21.4% additional cost of the U.S. Music Royalty Fee. That information would have been material to her. Had she known that information she would not have been willing to pay as much for her music plan and would have acted differently.

75.     Ms. Wilson has a legal right to rely now, and in the future, on the truthfulness and accuracy of Sirius XM's representations and advertisements regarding its music plan prices.

Ms. Wilson believes that she was given the services Sirius XM promised her—just not at the prices Sirius XM promised and advertised to her.

76.     Ms. Wilson first learned of Sirius XM's U.S. Music Royalty Fee scheme on February 14, 2023, when she saw a legal investigation advertisement on TopClassActions.com discussing the scheme. Prior to reading the advertisement, Ms. Wilson did not know or suspect that Sirius XM was secretly adding an additional music plan charge above the quoted rate in the form of the U.S. Music Royalty Fee. Ms. Wilson completed and submitted a form on the investigation webpage that same day, February 14, 2023, to learn if she qualified to be part of the legal actions.

77.     On March 22, 2023, Ms. Wilson sent Sirius XM a notice of dispute regarding her claims concerning Sirius XM's deceptive pricing and the U.S. Music Royalty Fee. Sirius XM made no effort to resolve the dispute.

78.     On June 5, 2023, Ms. Wilson filed a demand for arbitration against Sirius XM with the American Arbitration Association ("AAA").

79.     Ms. Wilson paid all arbitration fees associated with her demand for arbitration that the AAA asked her to pay.

80.     The AAA then asked Sirius XM to pay its required arbitration fees by August 28, 2023.

81.     On August 7, 2023, Sirius XM wrote a letter to the AAA stating that it would not pay its arbitration fees.

82.     On September 6, 2023, the AAA administratively closed Ms. Wilson's case due to Sirius XM's failure to pay its required arbitration fees.

## VII.    CLASS ALLEGATIONS

83.    Plaintiff brings this lawsuit as a class action pursuant to Federal Rules of Civil

Procedure 23(a), (b)(2), and (b)(3), seeking damages and statutory penalties under New York

state law on behalf of herself and all members of the following proposed nationwide class:

> **All current and former Sirius XM subscribers in the United States who signed up for a music plan on the Sirius XM website, and who paid a "U.S. Music Royalty Fee" within the applicable statute of limitations, specifically excluding citizens of California, New Jersey, Oregon, and Washington.**

84.    Plaintiff also seeks certification of the following New York subclass:

> **All current and former Sirius XM subscribers in New York who signed up for a music plan on the Sirius XM website, and who paid a "U.S. Music Royalty Fee" within the applicable statute of limitations.**

85.    **Application of the Discovery Rule.**  This Court should apply the discovery rule

to extend any applicable limitations period (and the corresponding class period) to the date on

which Sirius XM first began charging the U.S. Music Royalty Fee (which, based on the

investigation of Plaintiff's counsel, was in 2009). The nature of Sirius XM's misconduct was

non-obvious and intentionally concealed from its subscribers.  As a result of Sirius XM's

intentional misconduct, omissions, and affirmative misrepresentations throughout the customer

lifecycle, neither Plaintiff nor the Class members could have, through the use of reasonable

diligence, learned of the accrual of their claims against Sirius XM at an earlier time.

86.    Specifically excluded from the Classes are Sirius XM and any entities in which

Sirius XM has a controlling interest, Sirius XM's agents and employees, the bench officers to

whom this civil action is assigned, and the members of each bench officer's staff and immediate

family.

87.    Plaintiff reserves the right to redefine the Classes prior to class certification.

88.    **Numerosity.**  The members of each Class are so numerous that joinder of all

members would be impracticable.  While Plaintiff does not know the exact number of Class members prior to discovery, upon information and belief, there are tens of millions of members in the nationwide Class, and there are millions of members in the New York subclass. The exact number and identities of Class members are contained in Sirius XM's records and can be easily ascertained from those records.

89.    **Commonality and Predominance.**  All claims in this action arise exclusively from the uniform policies and procedures of Sirius XM as outlined herein.  This action involves multiple common questions which are capable of generating class-wide answers that will drive the resolution of this case.  These common questions predominate over any questions affecting individual Class members, if any.  These common questions include, but are not limited to, the following:

a.    Whether Sirius XM employed a uniform policy of charging the U.S. Music Royalty Fee to Plaintiff and Class members who subscribed to its music plans;

b.    Whether Sirius XM's policy and practice of advertising and quoting the prices of its music plans without the amount of the U.S. Music Royalty Fee is false, deceptive, or misleading;

c.    Why did Sirius XM not include the amounts of the U.S. Music Royalty Fee in the advertised and quoted prices for its music plans;

d.    Whether Sirius XM adequately and accurately disclosed the existence of the U.S. Music Royalty Fee, its nature or basis, or its amount, to Plaintiff and Class members;

e.    What is the nature or purpose of the U.S. Music Royalty Fee;

f.      Whether it was deceptive, misleading, and/or false for Sirius XM to put "U.S." in the beginning of the name of the U.S. Music Royalty Fee;

g.      Whether the true prices of Sirius XM's music plans, and of the U.S. Music Royalty Fee, are material information, such that a reasonable consumer would find that information important to the consumer's purchase decision;

h.      Whether Sirius XM has a policy and practice of signing up subscribers for automatic renewal, but never thereafter sending the subscriber any monthly or ongoing billing notices or invoices;

i.      Whether Sirius XM has a policy of intentionally preventing subscribers from noticing that they are being charged the Fee, including, but not limited to, Sirius XM's practice of signing up subscribers for automatic renewal but then never thereafter sending the subscriber any monthly or ongoing billing notices or invoices;

j.      Whether Sirius XM has a practice of falsely telling subscribers who notice and inquire about the U.S. Music Royalty Fee that it is "government mandated" or is a government pass-through fee;

k.      Whether New York law applies to the claims of Plaintiff and the Class;

l.      Whether Sirius XM has violated the implied covenant of good faith and fair dealing, implied in its contracts with Plaintiff and the Class, by imposing the U.S. Music Royalty Fee;

m.      Whether Sirius XM's misrepresentations, omissions, policies, and conduct alleged herein constitute deceptive acts or practices in violation of New York General Business Law § 349; and

28

n.    Whether Sirius XM's misrepresentations, omissions, policies, and conduct alleged herein constitute false advertising in violation of New York General Business Law § 350.

90.    **Typicality.**  Plaintiff, like all Class members, is a current or former subscriber of Sirius XM's music plans who signed up on Sirius XM's website and has been charged higher periodic rates than advertised and quoted at the time of sign-up due to Sirius XM's unilateral and extra-contractual imposition of the undisclosed U.S. Music Royalty Fee. Her claims all arise from the same course of conduct by Sirius XM, are based on the same legal theories, and face the same potential defenses. Plaintiff's claims are typical of all Class members' claims. Plaintiff is a member of the Classes she seeks to represent. All claims of Plaintiff and the Class arise from the same course of conduct, policy and procedures as outlined herein.

91.    **Adequacy.** Plaintiff and her counsel will fairly and adequately protect Class members' interests.  Plaintiff seeks the same relief for herself as for every other Class member, has no interests antagonistic to Class members' interests, and is committed to representing the best interests of the Class.  Moreover, Plaintiff has retained counsel with considerable experience and success in prosecuting complex class action and consumer protection cases.

92.    **Superiority.** A class action is superior to all other available methods for fairly and efficiently adjudicating this controversy.  Each Class member's interests are small compared to the burden and expense required to litigate each of his or her claims individually, so it would be impractical and would not make economic sense for Class members to seek individual redress for Sirius XM's conduct.  Individual litigation would add administrative burden on the courts, increasing the delay and expense to all parties and to the court system.  Individual litigation would also create the potential for inconsistent or contradictory judgments regarding the same

29

uniform conduct by Sirius XM. A single adjudication would create economies of scale and comprehensive supervision by a single judge. Moreover, Plaintiff does not anticipate any difficulties in managing a class action trial in this case.

93.    By its conduct and omissions alleged herein, Sirius XM has acted and refused to act on grounds that apply generally to the Class, such that declaratory relief is appropriate respecting each Class as a whole.

94.    Without the proposed class action, Sirius XM will retain the benefits of its wrongdoing.

## CAUSES OF ACTION

## COUNT I

### Violations of New York General Business Law § 349

95.    Plaintiff realleges and incorporates by reference all paragraphs previously alleged herein.

96.    New York General Business Law § 349 prohibits deceptive acts or practices in the conduct of any business, trade, or commerce.

97.    In its sale of music plans and satellite radio services from its headquarters in New York to customers in New York and throughout the United States, Sirius XM conducted business and trade within the meaning and intendment of New York General Business Law § 349.

98.    Plaintiff and Class members are each consumers who purchased services from Sirius XM for their personal use.

99.    By the acts and omissions alleged herein, Sirius XM has engaged in deceptive and misleading acts and practices designed to sell its music plans at prices higher than it advertised and promised to consumers, and to covertly and improperly squeeze additional money from its

customers for its own profit by unilaterally imposing the undisclosed, extra-contractual U.S. Music Royalty Fee.

100.    By reason of this conduct, Sirius XM has engaged and continues to engage in deceptive acts and practices in violation of the New York General Business Law § 349.

101.    Sirius XM's deceptive acts, misrepresentations, and omissions have a tendency to deceive, and in fact deceived, the general public, including Plaintiff and the Class.

102.    Sirius XM's deceptive acts, misrepresentations, and omissions were and are material, in that they were likely to, and did in fact, mislead reasonable consumers acting reasonably under the circumstances.

103.    Although not required by New York law, Plaintiff and Class members reasonably relied on Sirius XM's material misrepresentations, omissions, and deceptive policies and practices, and would not have purchased services from Sirius XM, or would not have paid as much for said services, had they known the truth about Sirius XM's policies and practices.

104.    Sirius XM knowingly and willingly committed these deceptive acts and practices for its own profit and for the profit of its shareholders.

105.    As a direct and proximate result of Sirius XM's deceptive actions, Plaintiff and Class members have been harmed and have lost money or property in the amount of the undisclosed, extra-contractual U.S. Music Royalty Fees that they paid to Sirius XM.

106.    Sirius XM's actions were the direct, foreseeable, and proximate cause of the damages that Plaintiff and the Class have sustained from having paid for and consumed Sirius XM's services.

107.    As a result of Sirius XM's deceptive actions and practices, Plaintiff and the Class members have suffered damages and are entitled to recover those damages or $50, whichever is

greater.  Plaintiff and Class members are also entitled to treble damages up to $1,000 because Sirius XM willfully and knowingly committed deceptive acts and practices in violation of New York General Business Law § 349.  Plaintiff and Class members are also entitled to initiate a program to provide refunds and/or restitution to Plaintiff and the Class.  Plaintiff is also entitled to reasonable attorneys' fees from Sirius XM.

**COUNT II**

**Violations of New York General Business Law § 350**

108.    Plaintiff realleges and incorporates by reference all paragraphs previously alleged herein.

109.    New York General Business Law § 350 prohibits false advertising in the conduct of any business, trade, or commerce.

110.    Sirius XM's material misrepresentations, omissions, and failures to disclose as described herein also constitute false advertising in violation of N.Y. Gen. Bus. Law § 350, which broadly declares unlawful all **"[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state."**

111.    Section 350-e allows any person who has been injured by any violation of section 350 or section 350-a to bring an action to recover actual damages or $500, whichever is greater, as well as to obtain an injunction to enjoin the unlawful false advertising. N.Y. Gen. Bus. Law § 350-e(3).

112.    By the acts and omissions alleged herein, including, *inter alia*, advertising and promising prices for its music plans that were not the true prices that it ultimately charged to customers, and failing to disclose the existence or amount of the U.S. Music Royalty Fee in its advertisements, Sirius XM has directly violated New York General Business Law § 350, causing damage to Plaintiff and the Class.

113.    By reason of this conduct, Sirius XM has engaged in false advertising in violation of the New York General Business Law § 350.

114.    Sirius XM's false advertising has a tendency to deceive, and in fact deceived, the general public, including Plaintiff and the Class.

115.    Sirius XM's false advertising is and was material, in that a reasonable person would attach importance to the information and would be induced to act on the information in making purchase decisions.

116.    Although not required by New York law, Plaintiff and Class members reasonably relied on Sirius XM's false advertising, and would not have purchased services from Sirius XM, or would not have paid as much for said services, had they known the truth about Sirius XM's policies and practices, and specifically had they known that Sirius XM's advertised and promised prices were false.

117.    Sirius XM knowingly and willingly made these false advertisements and misrepresentations for its own profit and for the profit of its shareholders.

118.    As a direct and proximate result of Sirius XM's false advertising, Plaintiff and Class members have been harmed and have lost money or property in the amount of the U.S. Music Royalty Fees they paid to Sirius XM.

119.    Sirius XM's actions were the direct, foreseeable, and proximate cause of the damages that Plaintiff and the Class have sustained from having paid for and consumed Sirius XM's services.

120.    As a result of Sirius XM's false advertising, Plaintiff and each Class member have suffered damages and are therefore entitled to recover those damages or $500 per person (whichever is greater).  Plaintiff and each Class member are also entitled to treble damages up to

$10,000 because Sirius XM willfully and knowingly conducted false advertising in violation of New York General Business Law § 350.  Plaintiff and each Class member are also entitled to initiate a program to provide refunds and/or restitution to Plaintiff and the class. Plaintiff is also entitled to reasonable attorney's fees from Sirius XM.

## COUNT III

### BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

121.    Plaintiff incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein.

122.    Sirius XM has violated the covenant of good faith and fair dealing by its conduct alleged herein, which includes but is not limited to:  unilaterally imposing the undisclosed, extra-contractual U.S. Music Royalty Fee; misrepresenting the prices of its music plans and concealing the true prices of its music plans in its advertising; misrepresenting the prices of its music plans by advertising or quoting prices that did not include the U.S. Music Royalty Fee; failing to disclose or adequately disclose the existence, amount, or nature of the U.S. Music Royalty Fee; and misrepresenting to members of the public that its own discretionary service charges are "government mandated," a government pass-through fee, a charge imposed to recover costs billed to Sirius XM by the government, a tax, or a charge over which Sirius XM has no control.

123.    Alternatively, to the extent any applicable contract could be read as granting Sirius XM discretion to impose the U.S. Music Royalty Fee—which Plaintiff does not concede—that discretion is not unlimited, but rather is limited by the covenant of good faith and fair dealing implied in every contract by New York law.

124.    Sirius XM has abused any discretion it purportedly had under any applicable contract to impose the U.S. Music Royalty Fee on Plaintiff and Class members.  For example:

a.      Sirius XM imposes the U.S. Music Royalty Fee as a covert way to charge subscribers higher rates for its music plans without having to advertise such higher rates;

b.      Sirius XM does not include the amount of the U.S. Music Royalty Fee in the advertised and quoted prices for its music plans;

c.      Sirius XM fails to disclose the Fee—or to even mention the words "U.S. Music Royalty Fee"—in any Sirius XM advertising, including in the fine print;

d.      Sirius XM fails to disclose and misrepresents the nature of the U.S. Music Royalty Fee by disguising it as "Fees and Taxes";

e.      None of Sirius XM's competitors charge any separate royalty fee over and above the advertised music plan price, such that Sirius XM knows that reasonable consumers would not expect Sirius XM to charge the U.S. Music Royalty Fee. Sirius XM knows that reasonable consumers would expect that the advertised price for Sirius XM's music plans would include the fundamental costs of obtaining the permissions necessary to provide the music content that Sirius XM has promised is included in those plans;

f.      In order to prevent subscribers from noticing they are being charged the U.S. Music Royalty Fee, Sirius XM has a policy and practice of signing up subscribers for automatic renewal by default and never thereafter sending the subscriber any monthly or ongoing billing notices or invoices;

g.      Sirius XM put "U.S." in the beginning of the name of the U.S. Music Royalty Fee to falsely indicate to consumers that it is a government-related fee; and

h.    Sirius XM has a practice of falsely telling customers who notice and inquire about the U.S. Music Royalty Fee that it is "government mandated" or is a government pass-through fee.

125.    Sirius XM's imposition of the U.S. Music Royalty Fee defied customers' reasonable expectations, was objectively unreasonable, and frustrated the basic terms of the parties' agreement.  Sirius XM's conduct and actions alleged herein were done in bad faith.

126.    Sirius XM's conduct described herein has had the effect, and the purpose, of denying Plaintiff and Class members the full benefit of their bargains with Sirius XM.

127.    Plaintiff and the Class members have performed all, or substantially all, of the obligations imposed on them under any applicable agreements with Sirius XM.  There is no legitimate excuse or defense for Sirius XM's conduct.

128.    Any attempts by Sirius XM to defend its overcharging through reliance on supposed contractual provisions will be without merit.  Any such provisions are either inapplicable or are unenforceable because they are void, illusory, lacking in mutuality, are invalid exculpatory clauses, violate public policy, are procedurally and substantively unconscionable, and/or are unenforceable in light of the hidden and deceptive nature of Sirius XM's misconduct, among other reasons.  Any such provisions would not excuse Sirius XM's abuses of discretion or otherwise preclude Plaintiff and the Class from recovering for breaches of the covenant of good faith and fair dealing.

129.    Plaintiff and members of the Class sustained damages as a result of Sirius XM's breaches of the covenant of good faith and fair dealing.  Plaintiff seeks damages in the amount of the U.S. Music Royalty Fees paid by Plaintiff and the Class members.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff asks this Court to:

A.      Certify the case as a class action and appoint Plaintiff and her counsel to represent the Classes;

B.      Declare that Defendant is financially responsible for notifying all Class members of Defendant's deceptive and unconscionable business practices alleged herein;

C.      Find that New York law applies to the claims of Plaintiff and the Class members;

D.      Find that Defendant's conduct alleged herein be adjudged and decreed in violation of the New York laws cited above;

E.      Declare that Defendant's policy of charging a deceptive, extra-contractual, and undisclosed U.S. Music Royalty Fee to be a violation of New York law;

F.      Order Defendant to hold in constructive trust all U.S. Music Royalty Fee payments received from the Class;

G.      Order Defendant to perform an accounting of all U.S. Music Royalty Fee payments it collected;

H.      Enter judgment in favor of each Class member for damages suffered as a result of the conduct alleged herein, to include interest and pre-judgment interest;

I.      Award Plaintiff and the Class members statutory, treble, and punitive damages;

J.      Award Plaintiff reasonable attorneys' fees and costs; and

K.      Grant such other and further legal and equitable relief as the Court deems just and equitable.

## JURY TRIAL DEMAND

PLEASE TAKE NOTICE that Plaintiff hereby demands a trial by jury as to all parties.

Dated:  June 26, 2024                    BY: _____

DeNITTIS OSEFCHEN PRINCE, P.C.
Stephen P. DeNittis, Esq.
315 Madison Ave., 3rd Fl.
New York, NY 10017
Telephone: (646) 979-3642
Facsimile: (856) 797-9978
Email: sdenittis@denittislaw.com

HATTIS & LUKACS
Daniel M. Hattis, Esq.*
Paul Karl Lukacs, Esq.*
11711 SE 8th St, Ste 120
Bellevue, WA 98005
Telephone: (425) 233-8650
Facsimile: (425) 412-7171
Email: dan@hattislaw.com
Email: pkl@hattislaw.com

* Pro Hac Vice Application To Be Submitted

*Attorneys for Plaintiff and the Proposed Classes*